**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re Application of Victor Mikhaylovich Pinchuk,<br><br>        Applicant, | )<br>)<br>)   C.A. No.<br>)<br>) |

**DECLARATION OF HENRY FORBES SMITH IN SUPPORT OF
*EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

I, Henry Forbes Smith, of One Essex Court, Temple, London EC4Y 9AR, United Kingdom, a Barrister of England & Wales, say as follows:

**PART A: INTRODUCTION**

1. I am a Barrister of England & Wales practising at the above address and am providing this declaration (the "**Declaration**") on behalf of the Applicant.

2. I make this Declaration in connection with the application by Mr. Pinchuk to the U.S. District Court for the District of Delaware under 28 U.S.C. § 1782 (the "**Section 1782 Application**") for evidence for use in international arbitration number 132459 at the London Court of International Arbitration (the "**LCIA Arbitration**"). I refer to the Request for Arbitration in the LCIA Arbitration dated 2 August 2013 (the "**Request for Arbitration**") (Exhibit 2) and the Responses thereto of the First Respondent dated 30 September 2013 (the "R1 Response") (Exhibit 3) and of the Second Respondent dated 30 September 2013 (the "R2 Response") (Exhibit 4).

3. This Declaration endeavours to state English law as I understand it to be. Except where otherwise appears, the matters addressed below are within my own knowledge. Where matters are not within my own knowledge, the source of my information is shown. I am instructed as counsel for the Applicant in English High Court proceedings against the Ukrainian Respondents (defined below in paragraph 6).

4. The cases referred to in this Declaration are publicly available. I understand that copies will be provided, as needed, by Delaware counsel.

**PART B: BACKGROUND**

**Parties**

5. The Claimant in the LCIA Arbitration, and the Applicant in the Section 1782 Application, is Mr. Victor Mikhaylovich Pinchuk (the "**Claimant**" or "**Mr. Pinchuk**"), a Ukrainian national currently resident in Ukraine, whose place of business is Parus Business Centre, 2 Mechnikova Street, Kiev 01601, Ukraine (see the Request for Arbitration, paragraph 2).

6. The First and Second Respondents to the LCIA Arbitration (together the "**Ukrainian Respondents**") are:

    (1) Mr. Igor Valeryevich Kolomoisky ("**Mr. Kolomoisky**"), a dual citizen of Ukraine and Israel, currently resident in Switzerland; and

    (2) Mr. Gennadiy Borisovich Bogolyubov ("**Mr. Bogolyubov**"), a citizen of Ukraine, currently resident in England (see the Request for Arbitration, paragraphs 4 and 5).

7. The Third Respondent to the LCIA Arbitration is Mr. Mikhail Iosifovich Spektor ("**Mr. Spektor**"), a citizen of Ukraine, whose place of business is in the Ukraine. Mr. Spektor is one of a group of three businessmen (the "**Russian Partners**") who are said to be party to relevant agreements, but from whom no monetary relief is sought in the LCIA Arbitration (see the Request for Arbitration, paragraphs 6, 10 and 86).

8. The Claimant, the Ukrainian Respondents, and the Russian Partners are collectively referred to as the "**Parties**".

**Relationship between the Claimant and the Ukrainian Respondents**

9. The Claimant, Mr. Pinchuk, says in the LCIA Arbitration that:

    (1) Mr. Pinchuk and the Ukrainian Respondents, Messrs. Kolomoisky and Bogolyubov, are Ukrainian businessmen who have extensive interests *inter alia* in the ferroalloys sector (see the Request for Arbitration, paragraph 20).

    (2)    Messrs. Kolomoisky and Bogolyubov have been business partners since the late 1980s. In or around 1992, they established the Ukrainian open joint stock company OAO PrivatBank. This is the core of the so-called Privat Group, a collection of assets and companies which Mr. Pinchuk maintains are jointly owned by Messrs. Kolomoisky and Bogolyubov and in which they each have a direct or indirect interest (see the Request for Arbitration, paragraphs 21-23).

10.    Mr. Pinchuk maintains in the LCIA Arbitration that:

    (1)    In their business dealings with Mr. Pinchuk since around 1999, Messrs. Kolomoisky and Bogolyubov have at all times acted as each other's duly authorised agents, with full authority to bind each other and deal with the assets held by them (see the Request for Arbitration, paragraph 25).

    (2)    Further or alternatively, Messrs. Kolomoisky and Bogolyubov have at all times held each other out as having authority to bind each other in matters relating to assets held by them, and at all material times Mr. Pinchuk dealt with them on the faith of their express and implied representations that each had authority to bind the other (see the Request for Arbitration, paragraph 26).

**The agreements concerning the Ferroalloy Holding**

11.    The dispute in the LCIA Arbitration arises out of what Mr. Pinchuk claims to be the improper actions of Messrs. Kolomoisky and Bogolyubov in relation to the so-called "Ferroalloy Holding" (the "**Ferroalloy Holding**").  The Ferroalloy Holding is not a single corporate entity but comprises a number of companies holding interests in ferroalloy assets by agreement among the parties.

12.    Mr. Pinchuk maintains that:

    (1)    The Ferroalloy Holding was created in late 2006 when Messrs. Kolomoisky and Bogolyubov as Party 1 and Mr. Pinchuk as Party 2 pooled together certain interests held by them in ferroalloy assets located in Ukraine to form

the Ferroalloy Holding (see the Request for Arbitration, paragraph 43 (and also paragraphs 29, 30, and 32)).

(2) On or around 4 September 2006, the allocation of the shareholding in the Ferroalloy Holding among the Parties was agreed as follows: Messrs. Kolomoisky and Bogolyubov would hold 50%, Mr. Pinchuk would hold 30%, and the Russian Partners would hold 20% (see the Request for Arbitration, paragraph 40(3)).

(3) The Parties subsequently procured the execution of further agreements such that after October 2010 their relative shareholding in the Ferroalloy Holding became 50% for Messrs. Kolomoisky and Bogolyubov, 25% for Mr. Pinchuk and 25% for the Russian Partners (see the Request for Arbitration, paragraphs 43-45 and in particular paragraph 44).

13. Mr. Pinchuk maintains that the Parties' rights and obligations in relation to the Ferroalloy Holding are set out in a written agreement executed on 7 November 2006 by Mr. Kolomoisky (acting for himself and Mr. Bogolyubov), by Mr. Pinchuk, and by Mr. Spektor (acting for himself and for the other Russian Partners) (the "**Agreement**") and in a series of other collateral agreements made in connection with the Agreement at around this time (see the Request for Arbitration, paragraphs 41, 43-45 and 47-59).

14. Mr. Pinchuk maintains that these agreements contained, among other matters, the following express or implied terms agreed upon by the Parties:

(1) The Parties had concluded the Agreement for the purpose of formalising principles for the conduct of an agreed policy in the context of the Ferroalloy Holding and to ensure the implementation of that agreed policy (see the Request for Arbitration, paragraph 51(1));

(2) By clause 2.5 of the Agreement, the Parties undertook "*to participate jointly in any other assets of the ferroalloy business and the business of raw materials for the production of ferroalloys in*" the agreed proportions, such that in the event that any party or parties to the Agreement were, during the currency of the Agreement, to contemplate acquiring or to acquire any

4

further ferroalloys assets, he/they would offer the other parties to the Agreement the opportunity to participate in such acquisition at cost, or alternatively at a reasonable price, in proportion to the Parties' respective interests in the Ferroalloy Holding at the time of such acquisition (see the Request for Arbitration, paragraphs 51(2) and 52);

(3) None of the Parties would take (or procure the taking of) any steps to destroy or diminish the value of the Ferroalloy Holding or the Parties' participation therein, and/or to misappropriate the assets or profits of the Ferroalloy Holding, whether through self-dealing transactions or otherwise (see the Request for Arbitration, paragraphs 53 and 55); and

(4) The profits of the Ferroalloy Holding would be distributed among the Parties in proportion to their respective interests therein, at least on an annual basis, and including all the profits of the Ferroalloy Holding less such allowance for working capital and capital expenditure requirements of the Ferroalloy Holding as might be agreed between the parties from time to time (see the Request for Arbitration, paragraphs 54-57).

15. Mr. Pinchuk's case in the LCIA Arbitration is that, since November 2006, Messrs. Kolomoisky and Bogolyubov have committed a number of serious breaches of these agreements in respect of the Ferroalloy Holding. In particular, Mr. Pinchuk maintains that Messrs. Kolomoisky and Bogolyubov have:

(1) Acquired ferroalloy assets without offering Mr. Pinchuk the chance to participate in those assets, in breach of clause 2.5 of the Agreement as noted in paragraph 14(2) above (see the Request for Arbitration, paragraphs 60, 62-71).

(2) Failed to procure the distribution to Mr. Pinchuk of his share of the profits of the Ferroalloy Holding, and misappropriated and diverted those profits to other companies owned or controlled by them, including by procuring companies forming part of the Ferroalloy Holding to trade at non-market prices *inter alia* with companies within the Privat Group (see the Request for Arbitration, paragraphs 61, 72-80).

5

16. Mr. Pinchuk seeks damages in respect of such breaches (see the Request for Arbitration, paragraphs 81-84).

**The Section 1782 Application**

17. Mr. Pinchuk alleges in the LCIA Arbitration that a number of companies or corporate groups in the ferroalloys industry within the Privat Group or otherwise owned and/or controlled jointly by the Ukrainian Respondents were party to non-arm's length transactions by which the Ukrainian Respondents procured the misappropriation and diversion of the profits of the Ferroalloy Holding in breach of the agreements. These companies include Chemstar Products LLC ("**Chemstar**"), Empire Chemical LLC ("**Empire**"), and Demeter Diversified LLC ("**Demeter**") (see the Request for Arbitration, paragraph 77(2), 77(3) and 77(8)).

18. I understand that the Section 1782 Application seeks discovery of evidence for use in the LCIA Arbitration from Chemstar, Empire, and Demeter, which are non-parties to the LCIA Arbitration.

**PART C: THE LCIA ARBITRATION**

19. In this part of the Declaration, I introduce the law governing the LCIA Arbitration and the means available for judicially reviewing or challenging an award issued in that arbitration in the English courts. I refer to the English Arbitration Act 1996 (the "**Arbitration Act 1996**" or the "**Act**") attached hereto at Exhibit 6.

**The Arbitration Agreement**

20. The LCIA Arbitration is brought in reliance on an arbitration agreement (the "**Arbitration Agreement**") contained in clause 11.2 of the Agreement (see the Request for Arbitration, paragraphs 9-12).

21. Mr. Pinchuk maintains that the Arbitration Agreement was made by Mr. Kolomoisky for himself and for Mr. Bogolyubov, and that the parties to the Arbitration Agreement were the Parties: Mr. Pinchuk; Messrs. Kolomoisky and Bogolyubov; and the Russian Partners (see the Request for Arbitration, paragraph 10).

**The law governing the LCIA Arbitration**

22. By the Arbitration Agreement, the parties to the Arbitration Agreement agreed to submit disputes relating to the Agreement to "*the exclusive jurisdiction of the London International Commercial Arbitration* [sic] *(hereinafter "LCIA") … [to] be heard in accordance with its rules*" (see the Request for Arbitration, paragraph 11). In my view, this is a reference to the London Court of International Arbitration (the "**LCIA**"), and by agreeing the Arbitration Agreement, the parties agreed to submit disputes relating to the Agreement to LCIA arbitration under the LCIA Arbitration Rules (the "**LCIA Rules**", which are attached at Exhibit 5 to this Declaration).

23. The Arbitration Agreement does not expressly provide for the seat of the arbitration. However, the parties to the Arbitration Agreement have agreed that the LCIA Rules will apply, including LCIA Rule 16.1 which provides that "*The parties may agree in writing the seat (or legal place) of their arbitration. Failing such a choice, the seat of arbitration shall be London, unless and until the LCIA Court determines in view of all the circumstances, and after having given the parties an opportunity to make written comment, that another seat is more appropriate*". By choosing the LCIA Rules without making any separate provision for the seat of the arbitration, the parties chose London, England as the seat of the arbitration unless and until the LCIA Court determines to the contrary. Moreover not only did the parties choose the LCIA Rules to govern their arbitration, but clause 11.1 of the Agreement provides that the Agreement is governed by English law (see the Request for Arbitration at paragraph 51(3)). Given these matters, it is likely that English law governs not only the Agreement but also the Arbitration Agreement contained therein.

24. Given these matters, and assuming that the parties did not reach any other agreement on the seat of the arbitration, it is in my view clear that London, England is the seat of the LCIA Arbitration. Accordingly, the LCIA Arbitration is subject to Part 1 of the Arbitration Act 1996 (as provided in sections 2(1) and 3(b) of the Arbitration Act 1996), and the procedural or curial law of the LCIA Arbitration is English law.

**The constitution of the Tribunal**

25. LCIA Rule 5.4 provides that following the Claimant's Request for Arbitration and the Respondents' responses (or 30 days after service of the Request if no response is provided), the LCIA will appoint an arbitral tribunal (the "**Tribunal**"). LCIA Rule 5.4 further provides that the LCIA will appoint a sole arbitrator unless the parties have agreed otherwise or unless the LCIA determines that in view of the circumstances of the case a three-member Tribunal is appropriate. The LCIA selects the member(s) of the Tribunal with due regard to any agreement that the parties may make and to the circumstances of the case, including the nationality, location and language of the parties (LCIA Rule 5.5). Where each side agrees to appoint one arbitrator each in a three-member Tribunal, the LCIA will select a third member as Chairman (LCIA Rule 5.6).

26. Mr. Pinchuk has submitted that the LCIA should determine that a three-member Tribunal is appropriate here, and that each side should be able to nominate one arbitrator, in which event Mr. Pinchuk has nominated an arbitrator (see the Request for Arbitration, paragraphs 14-15). The First and Second Respondents have accepted that a three-member Tribunal is appropriate and have jointly nominated an arbitrator, and the Third Respondent appears to have agreed with this (see paragraph 3 of the R1 Response and paragraph 9 of the R2 Response). The LCIA is likely to appoint a three-member Tribunal in accordance with the parties' agreement.

**The role of the Tribunal**

27. Once appointed, the Tribunal "*is in effect a 'quasi-judicial adjudicator'*": *Hashwani v. Jivraj* [2011] UKSC 40, [41] per Lord Clarke.[1] Like a court, the Tribunal is a first-instance decision-maker: it is charged with the general duty of finally resolving, adjudicating, and determining the parties' dispute, acting within the limits of its jurisdiction. The Tribunal is required "*(i) to act fairly and impartially as between all parties, giving each a reasonable opportunity of putting its case and dealing with that of its opponent; and (ii) to adopt procedures*

---

[1] *Hashwani v. Jivraj* [2011] UKSC 40, [41] per Lord Clarke, approving *K/S Norjarl A/S v. Hyundai Heavy Industries Ltd* [1992] 1 QB 863, 885B per Sir Nicholas Browne-Wilkinson V.-C. (later Lord Browne-Wilkinson).

*suitable to the circumstances of the arbitration, avoiding unnecessary delay or expense, so as to provide a fair and efficient means for the final resolution of the parties' dispute*" (LCIA Rule 14.1, see also section 33 of the Arbitration Act 1996). The Tribunal must decide the dispute in accordance with the complaint presented and the issues raised: it may not decide issues that the parties have not raised.

28. The Tribunal's role is to decide the law as well as the facts to resolve the dispute. Under section 46 of the Arbitration Act 1996, the Tribunal must resolve the dispute in accordance with the law chosen by the parties as applicable to the substance of the dispute or in the manner agreed by the parties, or failing that in accordance with the law determined by the conflict of law rules which the Tribunal considers applicable. The Tribunal has the power and generally the duty to decide relevant procedural and evidential matters, subject to the agreement of the parties: section 34(1) of the Arbitration Act 1996. The Tribunal may and often must hold hearings and receive factual and expert evidence (LCIA Rules 14.1, 16.2, 19.1, 20 and 21). The Tribunal is required to decide the case by issuing a written award and (unless the parties agree otherwise in writing) stating the reasons upon which its award is based (LCIA Rule 26.1).

29. Although the Tribunal has the power and often the duty to hear evidence and determine the facts, the Tribunal does not itself have the power to compel witness attendance. Section 43 of the Arbitration Act 1996 provides that, with the permission of the tribunal or the agreement of the parties, a party may use the same court procedures as are available in relation to legal proceedings to secure the attendance before the Tribunal of a witness to give oral testimony or to produce documents or other material evidence. Section 43(3) provides, however, that such court procedures may only be used if the witness is in the United Kingdom and the arbitration proceedings are being conducted in England and Wales or Northern Ireland. Section 43 cannot, therefore, be used to secure the attendance before the Tribunal of a witness present in the United States.

30. English law does not forbid the parties to an LCIA arbitration agreement such as that here from seeking the assistance of the U.S. courts in collecting evidence. English law recognises that it is for the U.S. courts to decide whether to assist.

**Judicial review of awards by English courts**

31. Since the LCIA Arbitration is seated in England, it is subject to Part 1 of the Arbitration Act 1996 and, by virtue of section 4(1) of the Act, to the mandatory provisions in Schedule 1 to the Act, which apply regardless of any agreement to the contrary.

32. Sections 66, 67, 68, 24 and 72 of the Arbitration Act 1996 are specified in Schedule 1 of that Act as mandatory provisions.[2] They apply regardless of any agreement to the contrary, and an award in the LCIA Arbitration will be subject to these provisions. These mandatory rules ensure that awards in English-seated arbitrations are subject to judicial review. Whilst it is an important policy of the Arbitration Act 1996 to uphold and enforce arbitral awards, it is an equally important policy to ensure that arbitral awards made without jurisdiction are annulled, and that, even where the Tribunal has jurisdiction, where something has gone badly wrong with the arbitral process the award can be set aside.

*Section 66: enforcement of the award and objections thereto*

33. Section 66(1) of the Arbitration Act 1996 provides that "*An award made by the tribunal pursuant to an arbitration agreement may, by leave of the court, be enforced in the same manner as a judgment or order of the court to the same effect*".[3] Arbitral awards are normally enforced, and defences to enforcement of an award are in general few and far between. However, leave to enforce is not a rubber-stamping exercise,[4] and in principle will not be given where the award was given without jurisdiction, or is vitiated by serious irregularity, or concerns non-arbitrable matters, or is contrary to fundamental English public policy.

---

[2] The full list of mandatory provisions set out in Schedule 1 is sections 9-13, 24, 26(1), 28-29, 31-33, 37(2), 40, 43, 56, 60, 66-68 and 72-75.
[3] By virtue of section 2(b) of the Act, this provision applies regardless of whether the seat of the arbitration in which the award is given is in England or abroad.
[4] *West Tankers Inc v. Allianz SpA* [2012] EWCA Civ 27, [38].

*Section 67: challenging the award: judicial review for lack of substantive jurisdiction*

34. The first sentence of section 67(1) of the Arbitration Act 1996 provides:

    *"A party to arbitral proceedings may (upon notice to the other parties and to the tribunal) apply to the court- (a) challenging any award of the arbitral tribunal as to its substantive jurisdiction; or (b) for an order declaring an award made by the tribunal on the merits to be of no effect, in whole or in part, because the tribunal did not have substantive jurisdiction."*

35. The English courts will decide quite separately from any decision of the Tribunal whether a party is bound by the arbitration agreement in question. Whilst the Tribunal is entitled to rule on its own jurisdiction,[5] its decision on jurisdiction is not binding on the parties, who may recontest that decision before the courts.[6]

36. The court will decide a jurisdictional challenge under section 67 by re-hearing the question of jurisdiction.[7] The court will not merely review the decision of the Tribunal, or decide whether that decision was one a reasonable tribunal could reach. Instead, the court will consider and decide for itself whether the Tribunal had jurisdiction.[8]

---

[5] Section 30 of the Arbitration Act 1996 and LCIA Rule 23.1.

[6] *Dallah Real Estate & Tourism Holding Co v. Pakistan,* [2010] UKSC 46, [86]; *Broda Agro Trade (Cyprus) Ltd v. Alfred C Toepfer International GmbH* [2010] EWCA Civ 1100, [39] per Stanley Burnton LJ: *"Arbitrators have always had the jurisdiction (perhaps more accurately a power), subject to any contrary provision in the arbitration agreement (which would be very unusual) to decide whether they have jurisdiction; but their decision as to whether or not they had jurisdiction was never binding on the parties. It was always open to a party to apply to the court for a declaration that the tribunal did have, or did not have, the contested substantive jurisdiction."*

[7] In *TTMI Sarl v. Statoil ASA* [2011] EWHC 1150, [16], Beatson J (later Beatson LJ) said *"In Dallah Real Estate v. Government of Pakistan [2010] UKSC 46,,albeit in the context of a challenge under s 103(2)(b) of the 1996 Act at the time of attempted enforcement, Lord Collins of Mapesbury stated at [96] that "The consistent practice of the courts in England has been that they will examine or re-examine for themselves the jurisdiction of arbitrators" and the question "can arise in a number of contexts, including a challenge to the tribunal's jurisdiction under section 67 of the 1996 Act." Lord Saville stated at [160] that whether an arbitrator has jurisdiction is a matter that the court must consider for itself. This reflects and confirms the decisions of the Commercial Court since the decision of Rix J in Azov Shipping Co v. Baltic Shipping Co [1999] 1 Lloyds Rep 68. Accordingly, the function of the court is to rehear the case rather than to review the arbitrator's decision."*

[8] Section 32 of the Arbitration Act 1996 provides that in some circumstances, a court may (on the application of a party) determine a jurisdiction challenge at an early stage of the arbitration, in

*Section 68: challenging the award: judicial review for serious irregularity*

37.  Section 68(1)-(2) of the Arbitration Act 1996 provides that:

> *"(1) A party to arbitral proceedings may (upon notice to the other parties and to the tribunal) apply to the court challenging an award in the proceedings on the ground of serious irregularity affecting the tribunal, the proceedings or the award.*
>
> *A party may lose the right to object (see section 73) and the right to apply is subject to the restrictions in section 70(2) and (3).*
>
> *(2) Serious irregularity means an irregularity of one or more of the following kinds which the court considers has caused or will cause substantial injustice to the applicant—*
>
> *(a) failure by the tribunal to comply with section 33 (general duty of tribunal);*
>
> *(b) the tribunal exceeding its powers (otherwise than by exceeding its substantive jurisdiction: see section 67);*
>
> *(c) failure by the tribunal to conduct the proceedings in accordance with the procedure agreed by the parties;*
>
> *(d) failure by the tribunal to deal with all the issues that were put to it;*
>
> *(e) any arbitral or other institution or person vested by the parties with powers in relation to the proceedings or the award exceeding its powers;*
>
> *(f) uncertainty or ambiguity as to the effect of the award;*
>
> *(g) the award being obtained by fraud or the award or the way in which it was procured being contrary to public policy;*
>
> *(h) failure to comply with the requirements as to the form of the award; or*
>
> *(i) any irregularity in the conduct of the proceedings or in the award which is admitted by the tribunal or by any arbitral or other institution or person vested by the parties with powers in relation to the proceedings or the award."*

---

particular where this is likely to produce substantial cost savings and there is good reason to determine it as a preliminary issue.

38. Section 68 provides an important means of judicial review, which is available even where the Tribunal acts within its jurisdiction. There must be a serious irregularity affecting the Tribunal, the proceedings or the award, falling within one of the closed list of categories set out in section 68(2). The court must be satisfied that the irregularity has caused (or will cause) substantial injustice to the applicant. If this is the case, section 68(3) provides that the English court may set aside the award, or may declare the award to be of no effect, or may remit the award to the Tribunal for reconsideration (in each case, in whole or in part).

39. The purpose of section 68 is not to allow the losing party to appeal adverse factual or legal findings: section 68 does not provide a second bite at the apple, or another crack at the merits.[9] "*Section 68 is not to be used simply because one of the parties is dissatisfied with the result*": *Bandwidth Shipping Corporation v. Intaari* [2007] EWCA Civ 998 per Lawrence Collins LJ (later Lord Collins) at [47].

40. Rather, section 68 recognises that "*the court should be able to correct serious failure to comply with the 'due process' of arbitral proceedings*": *Lesotho Highlands Development Authority v. Impregilo SpA* [2006] 1 AC 221, per Lord Steyn at [27]. Section 68 is "*intended for cases where it could be said that what had happened was so far removed from what could reasonably be expected of the arbitral process that the court could be expected to take action. It was 'really designed as a longstop, only available in extreme cases where the tribunal has gone so wrong in its conduct of the arbitration that justice calls out for it to be corrected'*"; section 68 asks "*whether the tribunal has given the parties a fair opportunity of addressing them on all issues material to their intended decision, or whether there has been a denial of a fair hearing. This will no doubt be a rare case ….*": *Bandwidth Shipping* at [46-47].

---

[9] Honest error of law or fact is not included in the closed list of substantial irregularities under section 68(2). Section 69 provides a limited right to appeal to the English court against certain arbitral rulings on questions of English law. However, section 69 is not a mandatory rule from which the parties may not agree to depart, but a default (non-mandatory) rule from which the parties may contract out. By agreeing to LCIA Rule 26.9, the parties to the Agreement contracted out of their right to appeal on questions of English law under section 69. Nonetheless, dishonest (i.e. deliberate and knowing) error of law or fact might still amount to substantial irregularity under section 68, which as noted above is a mandatory rule from which parties to English-seated arbitrations cannot contract out. Cogent evidence would be required to show dishonest error.

*Further conditions to section 67 and 68 challenges*

41. The right to bring a section 67 or 68 challenge can be lost. Applicants who take part in the arbitration must raise their objection in the arbitration to preserve their ability to bring a section 67 or 68 challenge, unless they did not know and could not with reasonable diligence have discovered the objection at the time they took part: section 73 of the Act. The challenger must first exhaust any available arbitral process of appeal or review, as well as any available recourse for correction of the award (or issue of an additional award) under section 57: section 70(2) of the Act (this does not apply to a person who did not take part in the arbitration: section 72(2) of the Act). Further, the challenge must be brought within 28 days of the award: section 70(3) of the Act.

*Section 24: removal of arbitrator*

42. Section 24 of the Arbitration Act 1996 permits an English court to remove an arbitrator on certain grounds, including that circumstances exist which give rise to justifiable doubts as to the arbitrator's impartiality (section 24(1)(a)), or that the arbitrator does not possess the qualifications required by the arbitration agreement (section 24(1)(b)), or that there are justifiable doubts as to the arbitrator's capacity to conduct the arbitral proceedings (section 24(1)(c)); or that the arbitrator is improperly conducting the proceedings in a manner which has caused or will cause substantial injustice to the applicant (section 24(1)(d)). Section 24 is another mandatory provision from which the parties cannot contract out.

I have executed this Declaration under penalty of perjury under the laws of the United States of America, 25 U.S.C. § 1746, this 23 of October 2013.

_____
HENRY FORBES SMITH

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re Application of Victor Mikhaylovich Pinchuk, | ) ) ) ) C.A. No. ) ) |
| Applicant, | |

## DECLARATION OF HENRY FORBES SMITH IN SUPPORT OF
## *EX PARTE* APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

_____

## EXHIBITS
_____

These are the Exhibits referred to in the Declaration of Henry Forbes Smith:

1. Curriculum vitae of Henry Forbes Smith
2. Request for Arbitration filed with the LCIA on 2 August 2013
3. R1 Response dated 30 September 2013
4. R2 Response dated 30 September 2013
5. LCIA Rules
6. English Arbitration Act 1996